IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| KENNETH TREKELL, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 4:18-cv-00662-DGK |
| TARGET CORPORATION, | ) ) ) |
| Defendant. | ) |

**PLAINTIFF'S RESPONSE AND SUGGESTIONS IN OPPOSITION TO DEFENDANT TARGET CORPORATION'S MOTION FOR SUMMARY JUDGMENT AND SUGGESTIONS IN SUPPORT**

COMES NOW Plaintiff, by and through his attorney of record, and for his Response to Defendant Target Corporation's Motion for Summary Judgment and Suggestions in Support (Docs 45, 46), states as follows:

**1. INTRODUCTION**

Plaintiff Kenneth Trekell was injured on February 18, 2018, at approximately 4:12 pm when a tractor-trailer bearing "Target" retail logos failed to yield and pulled in front of traffic at the intersection of 27th Street and Southwest Trafficway in Kansas City, Missouri. Plaintiff was thrown from his motorcycle after colliding with the vehicle in front of him, and the Target tractor trailer ran over his foot and ankle. The tractor-trailer left the scene. Plaintiff and his fiancé, who was riding a motorcycle behind him, both identified the tractor-trailer as a "Target" tractor-trailer. While Defendant Target Corporation maintains it did not have a trailer in the vicinity of the incident, both Plaintiff and his wife, Kelly, along with two independent witnesses at the scene also

1

identified the tractor-trailer as a "Target" retail tractor-trailer.  Target's corporate representative testified that Target tractor-trailers coming from Iowa were not at the scene of the accident, and all Target tractor-trailers initiating trips from Topeka would not be on the road in the Kansas City area after 6:30 am on any given day.  Plaintiff produced four witnesses who, in a short period of time, sited and/or photographed Target tractor-trailers during various times of the day in the Kansas City area, and Plaintiff has recently supplemented disclosures to add two more.

Plaintiff, after taking the deposition of the Target corporate representative, was granted leave to amend his original Compliant to include the theory of "Logo Liability" as recognized in Missouri. (Doc 38).  Plaintiff also pled joint venture, master/servant and *respondeat superior* given the significant control Target maintains over the carriers and drivers.

## II.   DEFENDANT'S STATEMENT OF UNCONTROVERTED FACTS

1. Admitted.

2. Admitted.

3. Plaintiff admits Target did not own any tractors, based upon information and belief. To the extent "truck" as set forth in paragraph 3 includes the trailer, Plaintiff denies.

4. Objection.  Paragraph 4 states a legal conclusion, invades the province of the jury, and is denied.  *See* Plaintiff's Additional Statement of Additional Uncontroverted Facts.

5. Objection.  Paragraph 5 states a legal conclusion, invades the province of the jury, and is denied.   *See* Plaintiff's Statement of Additional Uncontroverted Facts.

6. Plaintiff admits Target contracted with Dart Transit Company, Hogan Dedicated Services, LLC and Ruan Transportation Corporation to make deliveries.  Defendant denies those were the only three. (Deposition of Mike Mason pg. 7: 20-24, Exhibit 2)

2

Case 4:18-cv-00662-DGK   Document 50   Filed 08/21/19   Page 2 of 16

7. Denied. Plaintiff denies the cited testimony supports this fact. (Depo Maria Olson pgs. 33:19-22; 48:7-13; 144:6-8)

8. Denied. Plaintiff denies the cited testimony supports this fact. (Depo Olson pg. 47:7-13; 51:4-14)

**PLAINTIFF'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS**

9. Kelly Trekell saw a giant Target truck come out into their lane from a stop sign. (Deposition Kelly Trekell (Exhibit A), pgs. 26:10-25; 27:1-18)

10. Kelly Trekell saw a big Target on the side of the truck in red and white, and it had the word "Target" and a bullet by the word "Target." (Kelly Trekell, pgs. 34:11-14; 25:5-12)

11. Plaintiff Ken Trekell saw the tractor-trailer with "Target" on it and a bull's eye. (Depo Ken Trekell (Exhibit B), pgs. 72:4-18; 73:8-11, 24-25; 74:18)

12. Cory Hammond works for J.E. Dunn, had seen Target tractor-trailers in the Kansas City area before and identified the Target tractor-trailer at the scene of the accident. (Depo Hammond (Exhibit C), pgs. 4:7-22; 11:9-25; 12:1-12; 43:6-15)

13. Connor Donaldson works for Cerner Corporation, had seen other Target tractor-trailers in the Kansas City area, and identified the Target tractor-trailer at the scene of the accident. (Depo Donaldson (Exhibit D) pgs. 4:9-18; 21:11-18; 36:9-24; 37:15-20; 42:23-25; 43:3-12, 22-25; 44:1-4; 47:8-25; 48:1-12, 22-24)

14. Maria Olson was the Target corporate representative who testified by deposition on May 23, 2019. (Olson depo (Exhibit E – with depo exhibits 5, 6, 7, 8, and 10) pgs. 4:17-19; 5:5-11)

15. All GPS data for the Topeka, Kansas location and Target trailers has been destroyed. (Olson pg. 23:21-25)

16. The unload times for the tractor-trailers originating from Topeka and traveling into the Kansas City area has not changed since February 18, 2018. (Olson pg. 25:13-20)

17. There was no GPS information provided from the carrier for the Iowa location that showed a Target tractor-trailer at the scene of the accident, and Target would have no other way of getting that information. (Olson pgs. 26:14-25; 27:1-5, 19-25; 28:1-9, 19-24)

18. There would never be an occasion where there would be a Target truck in Kansas City other than those originating out of Topeka or Iowa. (Olson pg. 57:10-21)

19. The Topeka unload schedule has the last unload time as 6:30 am, and that is the same now as it was on February 18, 2019. (Olson pgs. 94:1-12; 153:7-9; Olson Exhibit 10)

20. When a driver makes a delivery to a Target store he leaves the distribution center, he arrives at the store, he pulls out the trailer that is currently at the store, backs up the fully loaded trailer the he just brought, and goes back to the distribution center. (Olson pg. 164:5-18)

21. The only variable from the Topeka unload schedule would be if the tractor-trailer arrives an hour prior to unload. (Olson pg. 152:11-24)

22. Any delivery from Topeka would have occurred before the times listed in Exhibit 10, and those times do not vary. (Olson pgs. 94:1-12; 153-155:1-12)

23. Anne Fisher saw two "Target" tractor-trailers on a date following the deposition of the corporate representative. One was on 135th Street at 69 Highway in Overland Park, Kansas at approximately 11:30-11:45 am, and the second was on 151st headed east at 69 Highway later

that day. She took a photo of the second tractor-trailer. (Depo Fisher (Exhibit F) pgs. 8:13-19; 9:1-25; 10:1-2, 24-25; 11:1-5, 12-23; 12:12-15, 23-25; 13:1)

24. Ed Colvin, a private investigator, took photos and a video of a Target tractor-trailer at I-435 and State Line Road at 12:28 p.m., and filmed it in the parking lot at the Target retail store near 89th and State Line Road in Kansas City, Missouri. (Colvin depo (Exhibit G) pgs. 5:16-17; 6:1-6; 8:7-12, 16-18, 24-25; 9:1-24)

25. Ellen Bledsoe is an employee of Edelman & Thompson, LLC and saw Target tractor-trailers on the way to and from work on three occasions at 7:19 am, 5:25 pm and 5:50-6:00 pm, on I-70 near Little Blue Parkway in Kansas City, Missouri, respectively, on dates following the deposition of the Target corporate representative. (Depo Bledsoe (Exhibit H) pg. 5:16-23; 8:15-25; 9:1-8)

26. Michael Mason is Plaintiff's attorney's husband and photographed a Target tractor-trailer on K-10 traveling between Lawrence, Kansas and Overland Park, Kansas on June 14, 2019 between 4:03 and 4:25 pm and pulling into the Target retail store at 12200 Blue Valley Parkway, Overland Park, Kansas. (Depo Mason (Exhibit I) , pgs. 5:17-19; 6:1-3; 7:20-24; 10-11:1-7)

27. Target gives its carriers a weekly schedule of routes that it prepares and sets the time and locations. (Olson pg. 24:1-13)

28. Target expects the carriers to be on time 99 percent of the time. (Olson pg. 45:13-15)

29. When the carriers are late they are "dinged" for performance. (Olson pgs. 44:7-10; 45:13-18)

5

30. Target trailers are required to comply with regulations of the United States Department of Transportation Federal Motor Carrier Safety Administration. (Olson pg. 48:7-13)

31. Target tractor-trailers have Target license plates on them. (Olson pg. 51:15-20)

32. Target is not aware of any other businesses, companies, or organizations that use trailers that have the Target logo on them. (Olson pg. 52:3-7)

33. Target trailers carry only regulated freight. (Olson pgs. 60:21-23; 144:6-8)

34. Target's operating procedures are given to the carriers. (Olson pg. 61:20-23)

35. Target and Target's carriers are "transportation partners". (Olson pgs. 63-64:1-7)

36. If a carrier is in an accident, major or minor, it is required to be reported to Target. (Olson pgs. 64:24-25; 65:1-4)

37. Target trains the carriers in the use of Target's portal for information and tools on how to ship goods for Target. (Olson pg. 67:5-25)

38. Target provides delivery procedures and responsibilities for the carriers. (Olson pgs. 77:23-25; 78:1-16)

39. The carriers' employees sit in the Target Distribution Center and the carriers have an on-site manager at the Target Distribution Center. (Olson pgs. 85:13-25; 86:1-10)

40. Target holds bi-weekly meetings with Target market leaders and the carriers' management. (Olson pg. 87:1-12)

41. Target can take corrective action against the carriers. (Olson pgs. 97:25; 98:1-3)

42. Target allows the carriers to subcontract out and can prohibit or limit a carrier's ability to perform services through a substitute service provider or subcontractor. (Olson pg. 105:5-17)

43. Target requires the carriers enroll as a transportation provider on the website "Target's Partners Online" and Target trains the carriers on that. (Olson pgs. 105:18-25; 106:1-8)

44. Carriers may use Target's name as required solely to perform services. (Olson pg. 109:12-17)

45. Target can audit, review and copy carriers' records at all reasonable times. (Olson pgs. 111:24-25; 112:1-5)

46. Target pays for the tolls incurred by the carriers during transportation. (Olson pg. 121:22-24)

47. Target has dedicated carriers that are specific to Target deliveries and loads. (Olson pg. 124:4-20)

48. There are times when Target trailers are stored at the carriers' locations. (Olson pgs. 135:20-25; 136:1-2)

49. Target has shipping visibility requirements and an electronic data interchange with data that is required of the carriers and business rules providing notification to Target that the carriers' drivers have reached the pickup locations. (Olson pg. 96:8-22)

50. Dart, Hogan and Ruan had contracts with Target (Olson: pgs. 16:18-25; 17-19:1-6; Depo Exhibits 5, 6, 7 and 8)

51. Dart, Hogan and Ruan have been the carriers for Target for at least 8 years. (Olson pgs. 98:4-25; 99:1-12)

52. Target requires that carriers perform repairs on the Target trailers upon request. (Olson Exhibits 6 and 7)

53. Carriers must comply with Target requests to reconsign or divert shipments enroute. (Olson Exhibits 6 and 7)

54. The carriers shall appropriately secure the goods in transit and shall not leave trailers unattended. (Olson Exhibits 6 and 7)

55. Target dictates submission of invoices and times. (Olson Exhibits 6 and 7)

56. Target and carriers share in losses as set forth in the contracts (Olson Exhibits 6 and 7)

57. Target provides a claims process for loss or damage as set forth in the contracts. (Olson Exhibits 6 and 7).

58. The carriers investigate claims as set forth in the contracts. (Olson Exhibits 6 and 7).

59. At Target's request, carriers will participate in periodic business reviews scheduled by Target and, at Target's direction to be held at a Target location. (Olson Exhibits 6 and 7)

60. The carriers shall perform such tasks as Target may request to prepare for the business reviews. (Olson Exhibit 6 and 7)

61. The purpose of the business reviews may include carrier's performance of services, duties and responsibilities, continuous improvement, compliance with laws, carrier's general safety performance and required safety rating, financial solvency, invoice timeliness and accuracy, and such other issues as Target may request. (Olson Exhibits 6 and 7)

62. Carriers shall maintain a dedicated team of senior leaders who devote sufficient time and attention to learn the culture and values of Target and Target's operational policies, processes and procedures, including by participating in specific relationship activities identified

8

by Target. Target acknowledges that Target's reputation is dependent upon carrier's maintenance of the highest standards in performing the services in a manner consistent with and reflects Target's culture and values. (Olson Exhibits 6 and 7)

A. **Standard of review.**

Summary judgment is appropriate only when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *See Id.* A court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial. *See Id.* at 249. A genuine issue exists if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party. *See Id.* Rather, the court must "draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party." *Hall v. Boston Scientific Corp.*, No. 2:12-cv-08186, 2015 WL 874760, at *1 (Feb. 27, 2015) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 578-88 (1986.) When there is a close question and reasonable minds could differ when weighing all the facts against the law, then summary judgment is inappropriate. *Walker v. Mod-U-Kraf Homes, LLC,* 775 F.3d 202, 208 (4th Cir. 2014).

B. **Plaintiff has pled and established a claim for negligence under Missouri law for "Logo Liability" against Target, and at minimum there are genuine issues of material fact.**

Target maintains that it is not a certified carrier and that, alone, relieves it of liability under Missouri Law. Target's reliance on the authority it cites is misplaced. Missouri recognizes at least two categories of "logo liability". The first is liability on a "carrier" (the tractor owner) when the carrier leases its tractor to another carrier without removing its placard or other signage. In *Johnson v. Pacific Intermountain Express, Co*., 662 S.W.2d 237 (Mo.Banc 1983), the court was presented with a situation where Mr. Johnson was killed in an accident with a 1978 Kenworth tractor-trailer owned by Tabor. Tabor owned or leased the tractor-trailer as a unit. There was evidence presented that the unit was leased to Pacific Intermountain Exp. Co. (PIE), including evidence of PIE placards affixed to the unit at the time of the accident. The court ultimately held PIE's liability was based on a regulation requiring an authorized "carrier" to remove any legend before relinquishing possession of the equipment. *Id.* at 244.

*Johnson* is cited by *Robertson v. Cameron Mutual*, 855 S.W.2d 442 (Mo. App. W.D. 1993). In *Robertson*, the Western District examined the three elements for vicarious liability between a certified "carrier" and the "driver's" negligence. It was not a case where the court considered logo liability between the owner of the trailer and the lessor "carrier". However, the court looked to *Johnson* for its holding:

> "….the Missouri Supreme Court discussed the vicarious liability of an I.C.C. certified carrier and held that the carrier may be held liable for the driver's negligence if the jury finds that: (1) the sign or identifying legend was furnished by the carrier in connection with a lease; (2) the sign was on the truck at the time of the accident; and (3) the truck was hauling regulated freight at the time of the accident."

10

*Id*. at 245.

Directly on point is *Parker v. Midwestern Distribution*, 797 S.W.2d 721 (Mo.App. E.D. 1990), which discusses the second area of liability for signage on the *trailer*. The Court in *Parker* considered a case very similar to the case before this Court where the driver of the tractor-trailer fled the scene of an accident and was never specifically identified. While the driver that was struck did not know what the I.C.C. number was on the tractor, he identified a "Leaseway" logo on the side and back doors of the *trailer*. Two independent witnesses also identified the "Leaseway" logo on the trailer. Midwestern Distribution owned the trailers, but not the tractors, and Midwestern was a subsidiary of "Leaseway". The tractors were owned by independent contractors leased on the basis they would haul Midwestern Distribution freight in "Leaseway" trailers. The court looked at the three elements necessary for logo liability.

> "We turn to the three elements identified in *Johnson*. There was evidence the trucks operated by Midwestern carried that logo and utilized trailers with the Leaseway logo. These tractors and trailers were operated under leases between Midwestern and the drivers. The identifying legends were on the tractor and trailer at the time of the accident. …From this evidence the jury could find it was more probable than not that the rig in question was carrying regulated freight at the time of the accident."
> *Id.* at 724.

None of the cases require that Target be a "carrier" for liability to attach. As noted by the *Johnson* court: "Our holding centers on the appearance of authority created and maintained when a sign is issued and not retrieved." *Johnson* at 246.

In the case before this Court, Plaintiff and three other people identified the tractor-trailer that left the scene as a "Target" retail tractor-trailer based upon the signage and logos on the trailer; there were contract agreements between Target and their carriers; and all Target trailers carry regulated freight. Consequently, Plaintiff has not only pled a cause of action for logo liability, he

11

has established the necessary facts for the finding of logo liability. At the very least, there are questions of fact for the jury to determine.

## C. There are genuine issues of material fact as to whether Defendant's carriers and drivers were employees and a jury could find a *respondeat superior* relationship between Target and its carriers and drivers.

Plaintiff has properly pled a cause of action for *respondeat superior* in setting forth that Target's carriers were acting at the direction and control of Target as agents and employees. Under Missouri law, the issue of whether the driver of the truck hauling the Target trailer was a Target employee under the doctrine of *respondeat superior* is one for the jury unless the material facts are undisputed and only one reasonable conclusion can be drawn from the facts. *Huggins v. FedEx Ground System, Inc.*, 592d F.3d 853 (2010) The determination of the issue depends upon the particular facts of each case.

> "The 'principal factors' that Missouri courts routinely consider in determining whether one acting for another is an employee or an independent contractor for purposes of respondeat superior liability are set out in Section 220(2) of the Restatement (Second) of Agency. *Lee v. Pulitzer Pub. Co.* 81 S.W.3d 625, 631 (Mo.Ct. App. 202); See *Johnson v. Pacific Intermountain Exp. Co*. 662 S.W.2d 237, 242n. 9 (Mo.1983); *Dean v. Young*, 396 S.W.2d 549, 553 (Mo.1965). The very first of these considerations is 'the extent of control which, by the [relevant] agreement, the master may exercise control over the details of the work.' Restatement (Second) of Agency Section 220(2)(a), and the Missouri Supreme Court has frequently emphasized the importance of the 'right to control the conduct of another in the performance of an act,' describing it as the 'touchstone' for determining whether a master-servant relationship exists, *see e.g., J.M. v. Shell Oil Co.*, 922 S.W.2d 759, 764 (Mo.1996)."
> *Id*. at 858.

In *Huggins*, Mr. Gutierrez was driving a tractor-trailer with logos for FedEx Ground Package System on it. Mr. Huggins was asleep in the truck when it hit another tractor-trailer

12

traveling in front of them. He brought suit against FedEx, and others involved. Huggins appealed the granting of summary judgment in favor of FedEx after the trial court determined the evidence could not support a finding that Gutierrez was an employee of FedEx. The United States Court of Appeals, 8th Circuit, concluded there was sufficient evidence for which a jury could find support for a claim based upon *respondeat superior*. The court looked at both the contract and the conduct of the parties, as well as the requirements of the carriers' drivers. The fact that the parties intended an independent contractor relationship did not control. In reviewing the trial court's judgement, the *Huggins* court stated:

> "In reaching its conclusion, the court relied heavily on specific provision in the agreement stating that the parties 'intended' that ANI 'will provide [its] services strictly as an independent contractor, and not as an employee of [FedEx] for any purpose' and will 'direct the operation of the Equipment and …determine the methods, manner and means of performing the obligations specified in the Agreement.' Although the district court acknowledged that the contract 'defined certain requirements regarding standards of service; performance; operator appearances; customer service; safety/conduct.' It concluded that ANI had discretion as to how to 'carry out' these 'objectives.' The court relied on provisions giving ANI 'sole discretion in determining the means and methods [by] which to carry out the foregoing objectives.' The Restatement notes the 'important distinction' that exists between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to.use care and skill in accomplishing results.' Restatement (Second) of Agency Section 220, comment (e); see also *Skidmore v. Haggard*, 342 Mo.837, 845, 110 S.W.2d 726, 730 (Mo.1937). In the former case, the actor is an employee or servant, in the latter an independent contractor."
>
> Of course, general contract provisions that confer on a party the discretion to determine the 'means and methods' for carrying out 'objectives' (language often used to describe the role of an independent contractor) will not trump provisions that actually reserve the right to control the details of that party's performance. Having carefully reviewed the agreement in this case, we conclude that it did not simply require ANI and its drivers to use skill and care in their work under the agreement, FedEx retained the right to control at least some of the 'means and methods' used by ANI and its drivers to achieve the contract's stated objectives." *Id*. at 858-59.

13

The *Huggins* court went on to discuss factors including safety and quality procedures, daily documentation, place of work, itineraries, what terminals were used for departure and return, length of time of employment, among others, that would be factors a jury could consider.

> "As we have said, the court may decide the question of whether a master-servant relationship exists as a matter of law only if 'no material fact[ ] giving rise to the determination is genuinely in dispute and when only one conclusion is reasonable. *Ascoli* 256 S.W. 3d 595. There is certainly record evidence tending to show that Mr. Gutierrez was an independent contractor. …But we believe that the evidence – including the terms of the written agreement, Mr. Huggins's declaration, and the documents showing that FedEx tested Mr. Gutierrez and checked into his background before he was hired – would support a reasonable inference and thus a jury finding that FedEx had a right to control his performance and was his employer for respondeat superior purposes. *See Shell Oil Co.*, 922 S.W. 2d at 764. We therefore conclude that the district court erred in holding that Mr. Huggins could not make out a claim against FedEx based on respondeat superior.
> *Id.* at 861.

In the case before this Court, there is an abundance of evidence that would support Plaintiff's claim of *respondeat superior* as set forth in Plaintiff's additional facts and the language of the contracts themselves. Because summary judgment is only proper where there are no genuine issues of material fact, summary judgment in this case must be denied.

### D. **There are genuine issues of material fact as to whether Target and its carriers were part of a joint venture.**

Plaintiff has properly pled joint venture as an alternative theory of liability. The additional facts and contracts raise jury issues as to the relationship between Target and its carriers and drivers.

Elements of a joint venture include: "(1) an express or implied agreement among members of the association; (2) a common purpose to be carried out by the members; (3) a community of pecuniary interest in that purpose; and, (4) each member has an equal voice or an equal right in

14

determining the direction of the enterprise. *Barfield v. Sho-Me Power Electic Cooperative,* 2013 WL 12145822 US Dist., W.D. Missouri, Not Reported in Fed. Supp. (2003), citing *Ritter v. BJC Barnes Jewish Christian Health Sys*. 987 S.W.2d 377, 387 (Mo. Ct. App. 1999). A joint venture may also be "implied and inferred, in whole, or in part, from the acts and conduct of the parties and from proven facts and circumstances showing that such enterprise was in fact entered into." *Scott v. Kempland*, 264 S.W.2d 349, 354 (Mo. 1954)

In this case there remain genuine issues of material fact under the contracts between the carriers and Target, and the conduct and practices as they apply to joint venture. The contracts are express agreements for the common purpose of delivering goods to Target locations with pecuniary interests for both parties. The contract and course of conduct present factual issues as to whether the carriers and Target had an equal voice in determining the direction of the work. Consequently, there remain genuine issues to be presented to a jury and summary judgment should be denied.

WHEREFORE, Plaintiff prays that Defendant's Motion for Summary Judgment be denied and for whatever other relief the Court deems fair and just.

Respectfully submitted,

EDELMAN & THOMPSON, L.L.C.

/s/ Leah M. Mason
Leah M. Mason    MO Bar # 40942
3100 Broadway, Suite 1400
Kansas City, Missouri 64111
(816) 561-3400
(816) 561-1664 (Fax)
lmason@etkclaw.com - e-mail

ATTORNEYS FOR PLAINTIFF

15

## CERTIFICATE OF SERVICE

A copy of the above and foregoing was mailed via the U.S. mail, prepaid postage, this 21st day of August, 2019, to:

Theresa A. Otto
John F. Baty
BATY HOLM NUMRICH & OTTO PC
4600 Madison Ave., Suite 210
Kansas City, MO 64112-3019
ATTORNEYS FOR DEFENDANT

                                                       /s/ Leah M. Mason
                                                     Attorney for Plaintiff

## CERTIFICATION UNDER RULE 55.03(A)

Pursuant to Rule 55.03(a), the undersigned certifies that she signed an original of this pleading and that an original of this pleading shall be maintained for a period of not less than the maximum allowable time to complete the appellate process.

                                                    /s/ Leah M. Mason
                                                   Attorney for Plaintiff